# United States Court of Appeals
## For the First Circuit

No. 05-1667

RUBÉN PERALTA,

Petitioner,

v.

ALBERTO R. GONZALES,
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Torruella and Lynch, <u>Circuit Judges</u>,
and Lasker,[*] <u>District Judge</u>.

Ilana Greenstein, with whom Harvey Kaplan, Lory Rosenberg, Maureen O'Sullivan, Jeremiah Friedman, and Kaplan, O'Sullivan & Friedman, LLP were on brief, for petitioner.
Andrew C. MacLachlan, with whom Peter D. Keisler, Assistant Attorney General, Civil Division, David V. Bernal, Assistant Director, and Ernesto H. Molina, Jr., Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, United States Department of Justice, were on brief, for respondent.

March 23, 2006

---

[*] Of the Southern District of New York, sitting by designation.

**LYNCH**, **Circuit Judge**. This case raises a new issue of interpretation of a 1997 immigration provision, the Nicaraguan Adjustment and Central American Relief Act (NACARA) § 203(a), Pub. L. No. 105-100, 111 Stat. 2160, 2196 (1997). NACARA § 203(a) amended and clarified a provision of a major immigration statute, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, Div. C, 110 Stat. 3009, 3009-546 (codified as amended in scattered sections of 5, 8, 18, 28, 42, & 48 U.S.C.).

The two provisions concern the concept of an alien's "continuous residence" and "continuous physical presence" in the United States. Continuous presence and/or residence for a specified period of years are basic eligibility requirements for certain types of discretionary immigration relief, including suspension of deportation and cancellation of removal. See 8 U.S.C. § 1229b(a), (b)(1), (d). Accrual of the requisite continuous time, however, can be broken without the alien actually leaving the country. Under 8 U.S.C. § 1229b(d)(1), an alien's presence and residence are deemed ended in two circumstances: when he or she has been served a notice to appear, id. § 1229b(d)(1)(A), or committed certain criminal offenses, id. § 1229b(d)(1)(B). These provisions are collectively known as the "stop-time rule." The question presented concerns the temporal reach of subsection

-2-

(B) of the stop-time rule, the provision relating to criminal offenses.

The petitioner, Dr. Rubén Peralta, works as a trauma surgeon at the Massachusetts General Hospital in Boston. More than a decade ago, he committed a crime, marriage fraud, which an Immigration Judge (IJ) determined fell within the universe of offenses listed in subsection (B). The IJ found that subsection (B), which took effect after Dr. Peralta committed the crime and after his deportation proceedings had begun, was retroactively applicable under the transitional rules of IIRIRA. The IJ therefore found Dr. Peralta ineligible for suspension of deportation[1] and pretermitted his application for that relief.[2] The Board of Immigration Appeals (BIA) affirmed.

On petition for review, Dr. Peralta argues that while IIRIRA's transitional rules may make subsection (A) retroactively applicable, they are silent as to subsection (B). He argues that given the existence of a separate provision that renders

---

[1]  Suspension of deportation was abolished in 1997 and replaced by a new discretionary form of relief, cancellation of removal. See 8 U.S.C. § 1229b. However, aliens placed in deportation proceedings before April 1, 1997, as Dr. Peralta was, remained eligible to apply for suspension of deportation. IIRIRA § 309(c)(1), 110 Stat. at 3009-625. The statutory scheme is discussed in more detail below.

[2]  "An application is pretermitted when disqualified for failure to meet the threshold eligibility requirement that an alien have resided in the United States for a sufficient period of time to obtain the discretionary relief of suspension of deportation." Afful v. Ashcroft, 380 F.3d 1, 6 (1st Cir. 2004).

prospective the application of IIRIRA except where Congress specifies to the contrary, this silence as to subsection (B) should be read as a clear congressional mandate that subsection (B) be applied only prospectively. Alternatively, he argues, the silence constitutes an ambiguity that we should interpret in his favor to avoid giving the statute impermissible retroactive effect.

We reject Dr. Peralta's reading of the statutory language. We find that IIRIRA's transitional rules (as amended by NACARA) clearly render subsection (B) retroactively applicable. This means his marriage fraud offense stopped his accrual of time, and so he was not eligible for the relief he sought. The BIA and IJ were correct. We deny Dr. Peralta's petition for review.

## I.

Dr. Peralta, a native and citizen of the Dominican Republic, entered the United States on April 26, 1986 as a visitor. On October 25, 1990, he married Patricia Lemonds, a United States citizen. Based on that marriage, he adjusted his status on January 23, 1991, to that of an alien admitted for conditional permanent residence. On November 4, 1992, Dr. Peralta and Lemonds jointly filed an application to remove the conditions on his residency. Soon after, however, investigators from the Immigration and Naturalization Service (INS)[3] discovered that the marriage was a

---

[3] On March 1, 2003, the INS ceased to exist and its principal functions were transferred to the Bureau of Immigration and Customs Enforcement in the Department of Homeland Security. See Homeland

-4-

sham: It had been arranged by a New Jersey attorney, David Biederman, and a Chicago immigration consultant, Marshall Schoeneman, for the express purpose of procuring immigration benefits for Dr. Peralta.  Investigators determined that Lemonds had been promised $1,000 for her cooperation, with $500 due before the marriage and $500 after the divorce.  The investigators also determined that Lemonds' signature had been forged on the November 4, 1992 application to remove the conditions on Dr. Peralta's residency.  Further, the IJ found, Lemonds was a drug addict and "was supplied with cocaine in order to secure her participation."

In 1994, the INS notified Dr. Peralta of its intent to terminate his immigration status; the termination became effective September 19, 1995.  Dr. Peralta also faced criminal prosecution: He and eleven other aliens were among twenty-seven people charged in a marriage fraud scheme run by Biederman and Schoeneman.  On October 4, 1995, Dr. Peralta pled guilty to violating former 8 U.S.C. § 1325(b) (1994) (now codified at 8 U.S.C. § 1325(c)), which forbids knowingly marrying for the purpose of evading immigration laws.  His conviction was entered January 2, 1996.  The judgment of conviction stated that his offense concluded on October 20, 1992.

---

Security Act of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205 (codified as amended at 6 U.S.C. § 291(a)).

On March 14, 1997, the INS issued Dr. Peralta an order to show cause[4] charging him with deportability as an alien whose conditional resident status had been terminated, and as an alien who fraudulently entered a marital agreement for the purpose of entering the United States. Those papers were filed with the immigration court on March 27, 1997. Since proceedings against Dr. Peralta commenced prior to April 1, 1997, the transitional rules of IIRIRA apply to his case. See Afful v. Ashcroft, 380 F.3d 1, 6 (1st Cir. 2004).

Dr. Peralta denied that he was deportable. In the alternative, he sought relief in the form of suspension of deportation. He submitted his suspension application on May 7, 1999.

Dr. Peralta's hearing before the IJ was delayed repeatedly, for reasons not relevant here. Finally, on July 31, 2003, an IJ found him deportable as charged. On December 8 of that year, the IJ pretermitted the application for suspension of deportation, ruling that Dr. Peralta was ineligible for the relief because of the stop-time effect of subsection (B) of 8 U.S.C. § 1229b(d)(1). The BIA affirmed on April 14, 2005. Dr. Peralta's sole contention on petition for review is that the agency's interpretation of subsection (B) was error, that he is eligible for

---

[4] The order to show cause was the pre-IIRIRA predecessor of the notice to appear.

-6-

consideration for suspension of deportation (now known as cancellation of removal), and that his application for such suspension of deportation should be heard on the merits.

**II.**

A.        The Statutory Framework

Under the Immigration and Nationality Act (INA) as it existed prior to 1997, aliens ordered removed from the United States could apply to the Attorney General for suspension of deportation.  This discretionary relief was available to an alien who could show, inter alia, that he or she had "been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application" and that "during all of such period he was and is a person of good moral character."  8 U.S.C. § 1254(a) (1994).

In 1996, however, Congress passed IIRIRA, which eliminated suspension of deportation and replaced it, effective April 1, 1997, with a procedure called cancellation of removal. IIRIRA § 304(a)(3), 110 Stat. at 3009-582 (codified at 8 U.S.C. § 1229b(b)(1)) (replacing INA § 244 with a new § 240A); see also Costa v. INS, 233 F.3d 31, 32-33 (1st Cir. 1999).  Among its requirements, the new cancellation of removal framework delineated a set of circumstances in which an alien's "continuous residence or physical presence" in the United States would be deemed terminated:

> (d) Special rules relating to continuous
> residence or physical presence.

(1) Termination of continuous period. For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end

(A) . . . when the alien is served a notice to appear under [8 U.S.C. § 1229(a)], or

(B) when the alien has committed an offense referred to in [8 U.S.C. § 1182(a)(2)] that renders the alien inadmissible to the United States under [8 U.S.C. § 1182(a)(2)] or removable from the United States under [8 U.S.C. § 1227(a)(2) or (a)(4)], whichever is earliest.

(2) Treatment of certain breaks in presence. An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsections (b)(1) and (b)(2) if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days.

. . . .

8 U.S.C. § 1229b(d). The first of these subsections, § 1229b(d)(1), is commonly referred to as the "stop-time rule." The second, § 1229b(d)(2), is known as the "90/180 rule."

In order to comprehend the present dispute, some understanding of the retroactivity provisions of two pieces of prior legislation is needed. Under the terms of IIRIRA, suspension of deportation remained available to aliens who had been placed in deportation proceedings prior to April 1, 1997. See IIRIRA § 309(c)(1), 110 Stat. at 3009-625. However, the suspension remedy was altered, even as to that class of aliens. Under IIRIRA's

-8-

transitional rules, 8 U.S.C. § 1229b(d) was given retroactive effect:

> TRANSITIONAL RULE WITH REGARD TO SUSPENSION OF DEPORTATION. -- Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to notices to appear issued before, on, or after the date of the enactment of this Act.

IIRIRA § 309(c)(5), 110 Stat. at 3009-627.

The wording of these provisions quickly led to problems. By their terms, they applied to "notices to appear." However, before enactment of IIRIRA, notices to appear did not exist; aliens at that time instead were served with "orders to show cause." This discrepancy left aliens already in proceedings before April 1, 1997, with room to argue that under the terms of IIRIRA § 309(c)(5), subsection (A) of the stop-time rule did not apply to them.

This argument was foreclosed in 1997, when Congress retroactively amended IIRIRA § 309(c)(5) to address the discrepancy. In relevant part, the amended provision reads as follows:

> (5) TRANSITIONAL RULES WITH REGARD TO SUSPENSION OF DEPORTATION. -- (A) IN GENERAL. -- Subject to subparagraphs (B) and (C), paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to orders to show cause (including those referred to in section 242B(a)(1) of the Immigration and Nationality Act, as in effect before the title III-A effective date), issued before, on, or after the date of the enactment of this Act.

NACARA § 203(a)(1) (emphasis added).

In interpreting NACARA, this circuit, and every other circuit to address the question, concluded "that the stop-time rule applies retroactively to orders to show cause issued prior to the enactment of the IIRIRA." Afful, 380 F.3d at 7 (collecting cases). These holdings came in cases dealing with subsection (A) -- cases, in other words, where the question was whether the issuance of an order to show cause prior to IIRIRA's effective date cut off the accrual of continuous presence or residence. See, e.g., Suassuna v. INS, 342 F.3d 578 (6th Cir. 2003); Ram v. INS, 243 F.3d 510 (9th Cir. 2001); Pinho v. INS, 249 F.3d 183 (3d Cir. 2001). The cases did not address the separate question of whether subsection (B) applied retroactively to cut off an alien's accrual of time at the moment, pre-IIRIRA, when that alien "committed an offense referred to in" 8 U.S.C. § 1182(a)(2). That is the question we address.

B.        The Agency Decisions

The IJ did not discuss any possible distinction between the retroactivity of the separate subsections (A) and (B). Instead, she asserted as a general matter that "the stop-time rules do, in fact, apply retroactively," and then applied subsection (B) to Dr. Peralta's claim.

Specifically, the IJ found that Dr. Peralta's violation of the marriage fraud statute began on November 19, 1990, when, one month after his "marriage" to Lemonds, he filed adjustment-of-

status documents with the INS and swore to the veracity of their contents. The IJ concluded he lacked good moral character, at least during the period the fraud was ongoing. The IJ made an additional finding that Dr. Peralta's crime was one of "moral turpitude" within the meaning of 8 U.S.C. § 1182(a)(2):

> The so-called spouse . . . in this case, a person who was a drug addict at the time, was supplied with cocaine in order to secure her participation. . . . The Court notes, in any event, that at its minimum, the essential elements of this crime are that the respondent intended to fraudulently obtain immigration benefits. And the Court deems it inescapable that this is a crime involving moral turpitude.

The IJ then applied subsection (B). Since that provision cuts off an alien's accrual of time "when the alien has committed an offense referred to in" 8 U.S.C. § 1182(a)(2), the IJ found that Dr. Peralta's presence ended on November 19, 1990. Since Dr. Peralta had only been in the United States for four years as of 1990, and since the IJ interpreted IIRIRA as barring any re-start of the continuous presence/residence clock once the stop-time rule had been triggered,[5] the IJ held that Dr. Peralta could not show that he had "been physically present in the United States for a continuous period of not less than seven years," as required by the suspension of deportation statute. See 8 U.S.C. § 1254(a) (1994).

---

[5] This interpretation, implicitly affirmed by the BIA, is not challenged by Dr. Peralta on petition for review.

-11-

The BIA affirmed, noting that it had previously held (1) that the stop-time rule "applies to applications for suspension of deportation" and (2) that the stop-time rule "operates to terminate the period of continuous physical presence as of the date that an alien commits an offense that renders him inadmissible under" 8 U.S.C. § 1182(a)(2). Combining these two propositions, the BIA held that subsection (B) must have retroactive effect. It applied subsection (B) and found that "because the respondent last entered [the United States] on April 26, 1986, and the record reflects that he concluded the offense of marriage fraud on October 20, 1992, less than 7 years later, the respondent did not have the requisite continuous physical presence to be eligible for suspension of deportation."[6]

### III.

           Dr. Peralta argues that the BIA's reading of subsection (B) is forbidden by rules of statutory construction, particularly retroactivity rules.

---

[6]  The BIA also addressed an argument by Dr. Peralta that he had relied on his potential eligibility for suspension of deportation when he pled guilty to a crime, and therefore under INS v. St. Cyr, 533 U.S. 289 (2001), the stop-time rule could not be retroactively applied. The BIA found that at the time he pled guilty, Dr. Peralta lacked sufficient accrued good moral character time to be eligible for suspension of deportation, and so he could not have relied on its availability. As we explain in Part III, we do not reach these issues, which properly arise only in the second step of the retroactivity inquiry required by Landgraf v. USI Film Prods., 511 U.S. 244 (1994).

"Despite the dangers inherent in retroactive legislation, it is beyond dispute that, within constitutional limits, Congress has the power to enact laws with retrospective effect." INS v. St. Cyr, 533 U.S. 289, 316 (2001).  However, "[a] statute may not be applied retroactively . . . absent a clear indication from Congress that it intended such a result." Id.  This is because "[r]equiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." Landgraf v. USI Film Prods., 511 U.S. 244, 272-73 (1994).

In Landgraf, the Supreme Court laid out a two-part test for assessing whether a statute should be retroactively applied. First, the court must "determine whether Congress has expressly prescribed the statute's proper reach." Id. at 280.  If this inquiry "leads to a firm conviction that Congress intended the statute to have a specific temporal reach, the retroactivity analysis ends"; we then apply the statute in accordance with Congress' command. Lattab v. Ashcroft, 384 F.3d 8, 14 (1st Cir. 2004).  The Supreme Court has said that the standard for finding an express congressional command, and thus ending the inquiry at the first stage, "is a demanding one." St. Cyr, 533 U.S. at 316. "Cases where this Court has found truly 'retroactive' effect adequately authorized by statute have involved statutory language

-13-

that was so clear that it could sustain only one interpretation." Id. at 316-17 (quoting Lindh v. Murphy, 521 U.S. 320, 328 n.4 (1997)). Nevertheless, "our inquiry is not limited to the statutory text but may include an examination of standard ensigns of statutory construction, such as the statute's structure and legislative history." Lattab, 384 F.3d at 14 (citing Martin v. Hadix, 527 U.S. 343, 355-57 (1999)).

If we find no express command as to the statute's temporal reach, we must engage the second step of the Landgraf test, determining "whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Landgraf, 511 U.S. at 280. "If the statute would operate retroactively, [the] traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." Id.

A.      Dr. Peralta's Arguments

On petition for review, Dr. Peralta argues that the Landgraf test requires reversal.

His primary argument is that Congress expressly commanded that subsection (B) should have only prospective effect, and that we need not reach step two of the Landgraf test in order to deem the BIA's decision erroneous. He begins with the language of the

-14-

two retroactivity provisions, IIRIRA § 309(c)(5) and NACARA § 203(a)(1). Under IIRIRA § 309(c)(5), the stop-time rule "shall apply" retroactively with respect to "notices to appear." 110 Stat. at 3009-627. Under NACARA § 203(a)(1), the stop-time rule "shall apply" retroactively with respect to "orders to show cause." 111 Stat. at 2196. Neither of these provisions, Dr. Peralta notes, says the stop-time rule "shall apply" retroactively to certain criminal offenses. He argues that by their terms, the provisions render retroactive only subsection (A), the portion of the stop-time rule concerned with notices to appear. Further, he says, the lack of any mention of "offenses" in the retroactivity provisions constitutes not an ambiguity, but a clear statement by Congress that subsection (B) applies prospectively. This is because Congress mandated in IIRIRA that the changes made by that statute (and those made by NACARA § 203(a), which retroactively amends an IIRIRA provision) have only prospective effect except where it specified to the contrary. IIRIRA § 309(c)(1), 110 Stat. at 3009-625 ("Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings as of the . . . effective date . . . the amendments made by this subtitle shall not apply."); see also Afful, 380 F.3d at 7.

Alternatively, Dr. Peralta argues, if we conclude that the retroactivity provisions are ambiguous, then under Landgraf's second step, application of the stop-time provision would have an

-15-

impermissible retroactive effect. He asserts that absent the stop-time rule he would have had sufficient continuous presence to qualify for suspension of deportation, and while due to his crime he did not have sufficient "good moral character" time either when he pled guilty or when his deportation proceedings began, he could have continued accruing such time throughout the pendency of his proceedings. Dr. Peralta argues that "[h]e would . . . have known that he retained the possibility of qualifying for relief." This potential future eligibility for relief is the right he says he "possessed when he acted" that would be impaired by application of the stop-time rule. Landgraf, 511 U.S. at 280.

B.      Analysis

Reading the relevant statutory provisions as a whole, we hold that Congress has expressly mandated that subsection (B) be applied retroactively. We do not reach the second stage of the Landgraf test.

The key to our analysis is the fact that the relevant provisions, IIRIRA § 309(c)(5) and NACARA § 203(a)(1), purport to render retroactive, to at least some extent, "paragraphs (1) and (2)" of 8 U.S.C. § 1229b(d) (emphasis added). Paragraph (2), the 90/180 rule, has nothing to do with the issuance of orders to show cause or notices to appear; it deals instead with breaks in continuous presence via actual departure from the country.

This dooms Dr. Peralta's statutory interpretation argument. His position, boiled down to its essence, is that when the two provisions say that § 1229b(d)(1) "shall apply" retroactively to "orders to show cause" and "notices to appear," they mean that only the section of § 1229b(d)(1) that actually mentions such orders and notices -- subsection (A) -- is rendered retroactive. If that were so for § 1229b(d)(1), however, it would also necessarily be so for § 1229b(d)(2). That would mean the references to paragraph (2) in IIRIRA § 309(c)(5) and NACARA § 203(a)(1) would be read out of the statutory text; paragraph (2) would never be retroactive under any circumstances, since it contains no mention of notices to appear or orders to show cause. "In construing a statute we are obliged to give effect, if possible, to every word Congress used." Rutanen v. Baylis (In re Baylis), 313 F.3d 9, 20 (1st Cir. 2002) (quoting Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979)).

In our own analysis, we start with the fact that the two provisions, IIRIRA § 309(c)(5) and NACARA § 203(a)(1), purport to have some effect on "paragraphs (1) and (2)" of 8 U.S.C. § 1229b(d). These two paragraphs create three fundamentally different triggering events, each of which cuts off the accrual of an alien's continuous presence and residence. The first trigger is issuance of an order to show cause or notice to appear; the second is commission of a specified crime; the third is actual departure

-17-

from the country.  Because of the "paragraph (1) and (2)" language, IIRIRA § 309(c)(5) and NACARA § 203(a)(1) must be read to render retroactive at least one of the triggers in each paragraph.  Given that, we see only one feasible conclusion: that the phrases "notices to appear" and "orders to show cause" function in this context as a shorthand for "cases."  In other words, when IIRIRA § 309(c)(5) and NACARA § 203(a)(1) say that the stop-time rule and the 90/180 rule "shall apply" to notices to appear and orders to show cause "issued before, on, or after the date of the enactment of this Act," they mean that the two rules are fully applicable, regardless of when an alien's proceedings commenced.  No other construction would give any effect to the two provisions' references to paragraph (2).[7]

Dr. Peralta argues that this interpretation involves impermissibly "read[ing] unwritten language in to Congressional

---

[7]  A lay person might reasonably wonder why, if Dr. Peralta has already been found once by the IJ to lack good moral character and to have committed a crime of moral turpitude, he should be given a chance to apply for suspension of deportation, wherein he must show good moral character.  Dr. Peralta argues that his moral character would be evaluated at the time the question would be reached at a hearing on his suspension of deportation request, not as of the date in 1997 when he was placed in deportation proceedings, and that he has worked very hard since he committed a crime to restore his good moral character -- indeed, that he relied on his ability to do so and so had a reliance interest.  He points out that his medical expertise has been used for the benefit of the public, and to the many letters of support for him.  Whatever merit there is to this argument, however, it cannot alter the outcome because Dr. Peralta is statutorily ineligible for suspension of deportation based on his lack of continuous presence.  We rest on this logically prior ground.

text." But our reading does no such thing. At least one circuit has taken the same approach as we do, applying subsection (B) retroactively, though without extended discussion. See Okeke v. Gonzales, 407 F.3d 585, 588 (3d Cir. 2005) (finding that petitioner's "commission of a controlled substance offense in 1983 . . . triggered the 'stop-time' provision," but remanding to the BIA on other grounds). Several more circuits have reached the same conclusion in the context of the 90/180 rule. See Mendiola-Sanchez v. Ashcroft, 381 F.3d 937, 939-41 (9th Cir. 2004) (concluding that the IIRIRA and NACARA provisions render the 90/180 rule retroactive); Rivera-Jimenez v. INS, 214 F.3d 1213, 1218 (10th Cir. 2000) (per curiam) (same); see also Tapia v. Ashcroft, 351 F.3d 795, 798-99 (7th Cir. 2003) (applying 90/180 rule retroactively). We have found no cases holding to the contrary.[8] And while our holding rests on the statutory text, it is entirely consistent with the legislative history.[9]

---

[8] Dr. Peralta argued in his reply brief that a Fifth Circuit case adopted his reading of the statutory language. However, that opinion has since been withdrawn, see Gonzalez-Garcia v. Gonzales, 2005 WL 3047411 (5th Cir. Nov. 15, 2005), and the unpublished decision that replaced it includes no discussion of the stop-time rule's retroactivity, see Gonzales-Garcia v. Gonzales, 2006 WL 346298 (5th Cir. Feb. 14, 2006).

[9] In addition to his textual arguments, Dr. Peralta posits that the legislative history supports his position. First, he notes that a House report on the bill that eventually became IIRIRA offers a rationale for making subsection (A) retroactive -- to prevent aliens from delaying their proceedings to accrue more continuous presence -- and no rationale that would go to the retroactivity of subsection (B). See H.R. Rep. No. 104-469, pt.

## IV.

Dr. Peralta has raised no other challenges to the BIA decision, and so we go no further. The petition for review is denied.

---

1, at 122 (1996). But this is to be expected, because at the time of the report, the future § 1229d(1) contained only the notice-to-appear stop-time rule; the criminal-offense portion had not yet been added. Id. at 24. Dr. Peralta also quotes a Senate committee memorandum that explained NACARA § 203(a)(1) and made no reference to criminal offenses. See 143 Cong. Rec. S12266 (daily ed. Nov. 9, 1997). But as we have said, Congress enacted NACARA § 203(a)(1) specifically to foreclose the argument that IIRIRA § 309(c)(5)'s use of the term "notice to appear" meant subsection (A) had only prospective effect. Afful, 380 F.3d at 7. It is hardly surprising that the memorandum would not mention subsection (B) in explaining such an amendment.