In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-3174

JEAN JOSEPH ODYL JEUDY,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR.,
Attorney General of the United States,

*Respondent*.

On Petition for Review of a Final Order of
the Board of Immigration Appeals.
No. A026-740-736.

ARGUED MAY 21, 2014 — DECIDED SEPTEMBER 15, 2014

Before BAUER, ROVNER, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Jean Jeudy petitions for review
of an order of removal issued by the Board of Immigration
Appeals (BIA). The BIA found that Jeudy was removable
based on a 1995 drug offense and a 2000 voting offense. It
also determined that he had not accrued the seven years of
continuous residence in the United States required for a per-
son in Jeudy's situation to request discretionary cancellation

of removal under 8 U.S.C. § 1229b(a).[1] Jeudy has been a law-ful permanent resident since 1989, and he reached seven years of continuous residence in 1996. The BIA, however, applied the "stop-time rule" of § 1229b(d)(1), which took ef-fect in 1997 as part of the Illegal Immigration Reform and Immigrant Responsibility Act. The new stop-time rule was applied to cut off Jeudy's period of continuous presence as of the time of his 1995 drug offense. Jeudy's petition for review challenges only this application of the stop-time rule to deny his eligibility to request cancellation of removal.

The BIA has determined that the stop-time rule applies retroactively to reach offenses that were committed before the rule's effective date. See *In re Robles-Urrea*, 24 I. & N. Dec. 22, 27 (BIA 2006); *In re Perez*, 22 I. & N. Dec. 689, 692–93 (BIA 1999) (en banc). Jeudy counters that (a) the stop-time rule cannot be applied retroactively because Congress did not provide any clear statement of intent to that effect, as re-quired by *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), and *INS v. St. Cyr*, 533 U.S. 289 (2001), and (b) applying the rule here would have an impermissible retroactive effect. This issue, which our court has not yet addressed, has divid-ed our colleagues in other circuits. See, e.g., *Sinotes-Cruz v. Gonzales*, 468 F.3d 1190, 1200–01 (9th Cir. 2006) (stop-time rule for offenses may not be applied retroactively); *Peralta v. Gonzales*, 441 F.3d 23, 29–31 (1st Cir. 2006) (opposing view).

We grant Jeudy's petition. The statutory stop-time rule does not convey a clear intent on the part of Congress to govern retroactively, and the stop-time rule would have an

---

[1] Where possible, we cite the United States Code rather than the corre-sponding section of the Immigration and Nationality Act.

impermissible retroactive effect if it were applied to Jeudy's 1995 drug offense to render him ineligible for discretionary relief after he had already accumulated the seven years of continuous residence needed to be eligible.

I.  *Factual and Procedural Background*

The relevant facts are not disputed. Because this case requires us to decide whether a particular provision of a federal statute applies retroactively, we weave in relevant legal developments.

A. *Petitioner's Offense and Changing Federal Immigration Law*

Petitioner Jean Jeudy immigrated to the United States from Haiti in 1980. He initially entered without inspection, but his status was adjusted to lawful permanent resident on November 24, 1989. Twenty years later, in 2009, the government issued to Jeudy a notice to appear charging him as removable based on three offenses. Only one conviction is relevant to the issue here.

On April 7, 1995, Jeudy pled guilty to attempted possession of crack cocaine. Under then-applicable law, this controlled-substance offense rendered Jeudy deportable. See 8 U.S.C. § 1251(a)(2)(B)(i) (1994) (repealed 1996). But an alien found to be deportable at that time could be eligible to request discretionary relief from the Attorney General to remain in the United States. Among other requirements, an alien had to accrue a certain period of continuous presence or residence in the United States. While Jeudy's 1995 drug conviction rendered him deportable, he continued to accrue time toward a period of continuous residence. Thus, on November 24, 1996, he reached the seven years required to

make him eligible to request discretionary waiver of inadmissibility if the government initiated deportation proceedings. See 8 U.S.C. § 1182(c) (1994).[2]

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act, known to the cognoscenti as IIRIRA, a complex statute that changed immigration law in many ways. The new law took effect, with some transitional exceptions, on April 1, 1997, several months after Jeudy became eligible for discretionary relief. The new law added a significant new limit on discretionary relief from removal: the "stop-time rule." Although a lawful permanent resident still needs seven years of continuous residence or presence to request discretionary relief under IIRIRA, the stop-time rule cuts off the accrual of time toward those years of continuous residence if and when a lawful permanent resident is served with a notice to appear or commits certain offenses. See 8 U.S.C. § 1229b(d)(1).

Jeudy concedes he was immediately removable under IIRIRA based on the 1995 drug conviction. See 8 U.S.C. § 1227(a)(2)(B)(i). But Jeudy—who has been in the United States since 1980, has no family in Haiti, and has three children who are American citizens—wants to request discretionary cancellation of removal under § 1229b(a). The issue in this case is whether the stop-time rule applies retroactively to cut off Jeudy's continuous residence as of the date of the drug conviction.[3]

---

[2] The cited version of § 1182(c) was repealed in 1996, but with only prospective effect. See *St. Cyr*, 533 U.S. 289.

[3] To be precise, the stop-time rule operates based on the date the offense is committed. The date of a resulting conviction (or even the existence of

B.  *The Administrative Proceedings*

At the removal hearing, the immigration judge found that Jeudy's drug conviction rendered him removable. The judge also found that the stop-time rule applied retroactively to the drug conviction to cut off Jeudy's period of continuous residence in 1995, before he reached the seven years needed to request cancellation of removal. Jeudy appealed to the Board of Immigration Appeals, which affirmed the immigration judge's decision in all respects. Jeudy then filed a petition for review with this court. We have jurisdiction pursuant to 8 U.S.C. § 1252.

II.  *Retroactivity of the Stop-Time Rule*

Jeudy wants to seek discretionary cancellation of removal. The eligibility requirements for that relief for permanent residents are codified as follows:

> The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—
>
> (1) has been an alien lawfully admitted for permanent residence for not less than 5 years,
>
> (2) has resided in the United States continuously for 7 years after having been admitted in any status, and

---

a conviction) does not matter. See 8 U.S.C. § 1229b(d)(1); *Baraket v. Holder*, 632 F.3d 56, 59 (2d Cir. 2011). The record here does not indicate when Jeudy committed his drug offense, though, so we refer instead to the date of conviction. Whether Jeudy actually committed his offense in 1994 or 1995 would not change the result. The critical facts are that the offense occurred (1) after Jeudy became a lawful permanent resident, (2) before he accrued seven years of continuous residence, and (3) before IIRIRA took effect.

(3) has not been convicted of any aggravated felony.

8 U.S.C. § 1229b(a). Jeudy had been lawfully admitted for more than five years and has never been convicted of an aggravated felony, so only the second requirement—seven years of continuous residence—is at issue.

By November 1996, before IIRIRA took effect, Jeudy had resided continuously in the United States for more than seven years after becoming a lawful permanent resident. The BIA found, however, that Jeudy had not accumulated seven years of continuous residence because of IIRIRA's 1997 addition of the statutory stop-time rule, codified as follows:

> For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end (A) except in the case of [a battered spouse or child], when the alien is served a notice to appear under section 1229(a) of this title, or (B) when the alien has committed an offense referred to in section 1182(a)(2) of this title that renders the alien inadmissible … or removable … .

8 U.S.C. § 1229b(d)(1) (effective April 1, 1997). Jeudy's period of continuous residence began with his admission as a lawful permanent resident in 1989. But Jeudy's drug offense rendered him inadmissible under § 1182(a)(2) and thus would count as an "offense" if the stop-time rule reached offenses committed before IIRIRA took effect. The decisive issue is one of statutory interpretation: whether the stop-time rule applies retroactively to attach this new consequence to pre-IIRIRA offenses.

"[T]he 'principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the

conduct took place has timeless and universal appeal.'" *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994), quoting *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J., concurring). A law operates retroactively when it "attaches new legal consequences to events completed before its enactment." *Id*. at 270. Because retroactive application inherently raises issues of fairness, courts have long applied a presumption against statutory retroactivity, reserving for Congress the "fundamental policy judgments concerning the proper temporal reach of statutes." *Id*. at 270–73. The statutory language must convey a clear intent to authorize retroactivity, assuring the courts that "Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." *Id*. at 272–73; see also *INS v. St. Cyr*, 533 U.S. 289, 318 (2001) (IIRIRA's repeal of the waiver of inadmissibility lacked the requisite "unmistakable clarity" to authorize retroactive application of change in law based on alien's criminal history).

Despite this strong presumption against retroactive application of statutes, the BIA has applied the stop-time rule to offenses committed before IIRIRA took effect without finding an impermissible retroactive effect. See *In re Robles-Urrea*, 24 I. & N. Dec. 22, 27 (BIA 2006); *In re Perez*, 22 I. & N. Dec. 689, 692–93 (BIA 1999) (en banc). As a general rule, of course, the BIA's precedential interpretations of the Immigration and Nationality Act are subject to *Chevron* deference, meaning that where the statute is ambiguous, courts will defer to the responsible agency's interpretation. See *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999); *Velásquez-García v. Holder*, No. 13-2610, 2014 WL 3611591, at

*3, ___ F.3d ___ ___ (7th Cir. July 23, 2014). There are exceptions to the *Chevron* rule, however, "for the simple reason that some questions of law do not depend on agency expertise for their resolution." *Zivkovic v. Holder*, 724 F.3d 894, 897 (7th Cir. 2013).

As the Supreme Court explained in *St. Cyr*, this case falls into such an exception: "Because a statute that is ambiguous with respect to retroactive application is construed under our precedent to be unambiguously prospective, there is, for *Chevron* purposes, no ambiguity in such a statute for an agency to resolve." 533 U.S. at 320 n.45, citing *Landgraf*, 511 U.S. at 264; accord, *Zivkovic*, 724 F.3d at 900 ("whether and to what extent certain amendments to the immigration laws apply retroactively" is a question of law "that this court must review *de novo*, without the use of *Chevron* deference"); *Martinez v. INS*, 523 F.3d 365, 372 (2d Cir. 2008) (same). In the immigration context, moreover, "the reluctance to impose rules retroactively is 'buttressed by the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien.'" *Velásquez-García*, 2014 WL 3611591, at *6, ___ F.3d at ___ , quoting *St. Cyr*, 533 U.S. at 320 (citation and some internal quotation marks omitted).

The retroactivity inquiry from *Landgraf* is often described as having two steps: first, whether Congress expressed clear intent for retroactive application, and then whether the statute would have an impermissible retroactive effect in the given case. See, e.g., *Martinez*, 523 F.3d at 370. "In other words, silence or ambiguity in the statutory text and history requires the court to move on to step two, not to declare a victory for the opponent of retroactivity." *Id.* at 372, citing *St. Cyr*, 533 U.S. at 320. We proceed in that order.

A. *Step One Under Landgraf*

Step one asks whether there is a clear statement from Congress that it intended for the stop-time rule to apply retroactively. Under the rule, time stops accruing upon issuance of a notice to appear or commission of certain criminal offenses. See 8 U.S.C. § 1229b(d)(1). As the government notes, the text of the stop-time rule does not include any temporal language. Because the text of § 1229b(d)(1) lacks this language, the government must look elsewhere for a clear statement of congressional intent to rebut the presumption against retroactivity.

One possible source is the definition of "offense" in § 1182(a)(2)(A)(i):

Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of—

(I) a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime, or

(II) a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21),

is inadmissible.

If this definition is applied retroactively, Jeudy's 1995 drug conviction is clearly an "offense." But like the stop-time rule itself, the definition of an offense contains no temporal

language that could rebut the presumption against retroactivity.

In fact, another closely-related definition—of "aggravated felony"—enacted in the same section of IIRIRA as the stop-time rule shows a clear indication of retroactive application. An alien may be rendered ineligible for cancellation of removal by conviction of any aggravated felony. 8 U.S.C. § 1229b(a)(3). The IIRIRA definition for aggravated felony states: "Notwithstanding any other provision of law (including any effective date), the term applies regardless of whether the conviction was entered before, on, or after September 30, 1996." *Id.* § 1101(a)(43). We have applied this language to hold that an aggravated felony committed before IIRIRA's effective date renders the person ineligible for cancellation of removal. See *Zivkovic*, 724 F.3d at 906–07.

The absence of similar language in the definition of an "offense" for purposes of the stop-time rule for purposes of cancellation of removal under § 1229b(d)(1) is a powerful argument against retroactivity. See, e.g., *St. Cyr*, 533 U.S. at 318–19 ("Another reason for declining to accept the INS' invitation to read § 309(c)(1) as dictating the temporal reach of IIRIRA § 304(b) is provided by Congress' willingness, in other sections of IIRIRA, to indicate unambiguously its intention to apply specific provisions retroactively.").

To avoid that conclusion, the government directs us to a different provision: the transition rule from IIRIRA § 309(c)(5). As enacted in IIRIRA, it stated:

> TRANSITIONAL RULE WITH REGARD TO SUSPENSION OF DEPORTATION.—

Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to notices to appear issued before, on, or after the date of the enactment of this Act.

IIRIRA, Pub. L. No. 104–208, § 309(c)(5), 110 Stat. 3009, 3009–627 (1996). This reference to "notices to appear" was a mistake. Notices to appear were first created by IIRIRA, so there were no notices to appear issued before IIRIRA took effect. The pre-IIRIRA equivalents were called orders to show cause. Once the problem was recognized, the transitional rule was amended to apply to "orders to show cause … issued before, on, or after the date of the enactment of this Act." Nicaraguan Adjustment and Central American Relief Act (NACARA), Pub. L. No. 105–100, § 203(a), 111 Stat. 2160, 2196 (1997). In the following discussion, we refer below to "notices to appear" and "orders to show cause" interchangeably as "immigration documents."

The government correctly notes that the temporal language of the transitional rule is clear: "before, on, or after" unmistakably indicates retroactivity. But that does not settle the matter because the question is the scope of the transitional rule's retroactivity. The rule itself says that INA § 240A(d) paragraph (1) (the stop-time rule) and paragraph (2) (the "90/180 rule")[4] "shall apply to orders to show cause." NACARA § 203(a). The issuance of an immigration docu-

---

[4] See 8 U.S.C. § 1229b(d)(2) ("An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsections (b)(1) and (b)(2) of this section if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days.").

ment, however, is only one of three different events that cut
off the accrual of time for purposes of cancellation of remov-
al. In fact, there are three distinct triggering events that stop
the accrual of an alien's continuous presence: (1) issuance of
immigration documents (Paragraph (1), subpart (A)); (2)
commission of certain offenses (Paragraph (1), subpart (B));
and (3) violation of the 90/180 rule (Paragraph (2)). Thus, the
issue is whether the transitional rule of IIRIRA § 309(c)(5), as
amended by NACARA § 203(a), gives retroactive effect to all
three triggering events.

There is no question about the first triggering event. Un-
der the plain text of the transitional rule, the stop-time rule
applies retroactively to the issuance of immigration docu-
ments. See IIRIRA § 309(c)(5) ("shall apply to notices to ap-
pear"); NACARA § 203(a) ("shall apply to orders to show
cause"). So the question becomes whether the transitional
rule gives retroactive effect to the other two triggering
events, particularly the commission of a covered offense.

Some courts have held that the transitional rule gives ret-
roactive effect to all three triggering events. The First Cir-
cuit's approach in *Peralta v. Gonzales*, 441 F.3d 23 (1st Cir.
2006), is illustrative. Relying on the cross-references to Para-
graphs (1) and (2) of INA § 240A(d), the *Peralta* court rea-
soned that because the transitional rule refers to both Para-
graph (1) *and* Paragraph (2), and because Paragraph (2) does
not mention the issuance of immigration documents, the
provision must be interpreted to give retroactive effect not
just to the issuance of immigration documents but also to the
90/180 rule and the commission of certain offenses. See *id.* at
31. If it did not, the cross-reference to Paragraph (2) would
be mere surplusage, since Paragraph (2) does not mention

immigration documents. *Peralta* therefore equated issuance of the immigration documents with any *proceeding* initiated by an immigration document. As the court put it, "the phrases 'notices to appear' and 'orders to show cause' function … as a shorthand for 'cases'" initiated by those documents. *Id.* It then concluded that the stop-time rule and the 90/180 rule "are fully applicable, regardless of when an alien's proceedings commenced." *Id.* The Fifth Circuit followed this approach, concluding that reading the transitional rule as applying only to the first triggering event (the issuance of immigration documents) would "render[] the reference to paragraph (2) … meaningless." *Heaven v. Gonzales*, 473 F.3d 167, 176 (5th Cir. 2006), citing *Peralta*, 441 F.3d at 31.[5]

There is a problem with this interpretation, however. Neither version of the transitional rule actually says this. The operative clause of the original transitional rule stated: "Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to notices to appear issued before, on, or after the date of the enactment of this Act." IIRIRA § 309(c)(5). And the amended transitional rule merely substituted "orders to show cause" for "notices to appear," without making any substantive change. See NACARA

---

[5] The *Heaven* court noted that *Peralta* was potentially distinguishable on the ground that *Peralta* was a case brought directly under the transitional rules. The *Heaven* court concluded, however, that this distinction did not make a difference. See 473 F.3d at 176 ("The First Circuit dismissed such an argument in *Peralta*, which is a case brought under the transitional rules of the IIRIRA but is nonetheless correct in its analysis of this issue.").

§ 203(a). Neither version mentions "cases" or "the proceed-ings initiated by" the immigration documents.

Recognizing this ambiguity, the Second and Ninth Cir-cuits have held that the transitional rule simply does not provide the requisite clarity from which to infer that the permanent stop-time rule of 8 U.S.C. § 1229b(d)(1)(B) should be applied retroactively. See *Martinez v. INS*, 523 F.3d 365, 371 (2d Cir. 2008) ("Assuming that it would be 'incongruous' for the stop-time rule to apply retroactively in transitional cases but not permanent-rule cases, that fact does not give us license to artificially stretch the transitional rules to cover this case."); *Sinotes-Cruz v. Gonzales*, 468 F.3d 1190, 1200 (9th Cir. 2006) ("[W]e conclude that the transitional rule does not clearly indicate that it is to be applied retroactively to part B of § 1229b(d)(1) in all circumstances.").

At any rate, these arguments for interpreting an impre-cise statute do not reach the heart of the retroactivity inquiry. Courts must avoid retroactive application "'unless com-pelled to do so by language so clear and positive as to leave no room to doubt that such was the intention of the legisla-ture.'" *Landgraf*, 511 U.S. at 272, quoting *Chew Heong v. Unit-ed States*, 112 U.S. 536, 559 (1884). The government's argu-ment based on the awkward transitional rule is at best the legal equivalent of a double bank-shot. It fails to show that Congress came to grips with the potential unfairness of ret-roactive application of the permanent stop-time rule to deny eligibility for discretionary relief. That is the political-process foundation of the presumption against retroactivity set forth in *Landgraf* and *St. Cyr*. That presumption simply cannot be overcome by such an indirect argument.

By its terms, the transitional rule of IIRIRA § 309(c)(5), as amended by NACARA § 203(a), applies only to the issuance of immigration documents. It indicates that Congress considered the potential unfairness of stopping time retroactively for the issuance of immigration documents, a conclusion that is reflected in the legislative history showing that Congress wanted to prevent aliens from satisfying the continuous residence rule by stalling in their pending immigration proceedings. See *Angel-Ramos v. Reno*, 227 F.3d 942, 947 (7th Cir. 2000) (noting that Congress intended to codify the majority decision in *In re N-J-B-*, 21 I. & N. Dec. 812, 820 (BIA 1997)); accord, *In re N-J-B-*, 21 I. & N. Dec. at 820 ("[T]he immigration reforms in question were motivated by a desire to remove the incentive for aliens to prolong their cases by ending the accrual of time in residence for suspension of deportation when deportation proceedings were commenced[.]"), vacated by Att'y Gen. Order No. 2093–97 (July 10, 1997). There is no similar indication that Congress considered the additional unfairness of retroactive application to the commission of certain offenses and travel that violates the 90/180 rule. And the concern identified in the legislative history—stalling during pending immigration proceedings—does not apply in the context of a criminal offense or travel, since these events do not automatically trigger immigration proceedings.

The event that potentially stopped Jeudy's continuous presence clock in 1995 was an offense, not the issuance of immigration documents. The transitional rule does not mention offenses. Against the backdrop of the presumption against retroactivity, a cross-reference in the ambiguous transitional rule does not meet the high standard of "unmistakable clarity" required to authorize retroactivity. See *St.*

*Cyr*, 533 U.S. at 318. We therefore adhere to a reading authorizing retroactivity only to orders to show cause, a result consistent with our decision in *Angel-Ramos*, the text of the transitional rule, and the presumption against retroactivity.

B.  *Step Two Under Landgraf*

We now turn to step two of the *Landgraf* analysis: whether, in the absence of clear language authorizing retroactivity, application of the stop-time rule to Jeudy's 1995 drug conviction would have an impermissible retroactive effect. We hold that it would.

Jeudy's drug offense and conviction did not disqualify him from discretionary relief when they occurred, and Jeudy was actually eligible for discretionary relief before IIRIRA took effect. As a result, applying the stop-time rule would attach a new and serious consequence to Jeudy's criminal conduct that was completed before IIRIRA took effect. See *Landgraf*, 511 U.S. at 269–70. Jeudy need not show that he actually relied on the future availability of discretionary relief when committing the offense because detrimental reliance is not required. See *Vartelas v. Holder*, 132 S. Ct. 1479, 1491 (2012); *Zivkovic*, 724 F.3d at 902–03 ("Where a finding of retroactivity would saddle the petitioner with new consequences from an old conviction, the affected person need not also demonstrate that he relied on the absence of those new consequences.").

The government, following the reasoning of the BIA, argues that the stop-time rule has no impermissible retroactive effect in this case because Jeudy seeks cancellation of removal, which was "created" by IIRIRA just as the stop-time rule was. The government reasons that any rule affecting cancel-

lation of removal therefore cannot affect legal rights predating IIRIRA. See *In re Robles-Urrea*, 24 I. & N. Dec. 22, 27 (BIA 2006) ("Section 240A [providing for cancellation of removal] was not in existence … at the time the respondent committed his offense … . It is therefore difficult to understand how he might have relied on the future availability of such relief as undergirding a retroactivity claim.").

This argument is not persuasive. Cancellation of removal is merely a new name for essentially unchanged discretionary relief from immigration sanctions. That relief has been a fixture of immigration law in different forms since 1917. See *St. Cyr*, 533 U.S. at 293–96. And while cancellation of removal itself is "discretionary and prospective in nature," *In re Perez*, 22 I. & N. Dec. 689, 691 (BIA 1999) (en banc), the issue here is eligibility to request the relief at all. "[A] determination about a break in physical presence is a 'non-discretionary question of statutory interpretation.'" *Cuellar Lopez v. Gonzales*, 427 F.3d 492, 495 (7th Cir. 2005), quoting *Morales-Morales v. Ashcroft*, 384 F.3d 418, 423 (7th Cir. 2004). The change in statutory terms does not avoid the unfairness of retroactive application of the stop-time rule to Jeudy's eligibility for discretionary relief, which he had acquired before IIRIRA and its stop-time rule took effect. See *Sinotes-Cruz*, 468 F.3d at 1202–03; *Henry v. Ashcroft*, 175 F. Supp. 2d 688, 695–96 (S.D.N.Y. 2001).

Some other courts have decided this question against petitioners situated similarly to Jeudy. See *Martinez v. INS*, 523 F.3d 365, 376 (2d Cir. 2008); see also *Valencia-Alvarez v. Gonzales*, 469 F.3d 1319, 1327–28 (9th Cir. 2006) (petitioner, unlike Jeudy or Sinotes-Cruz, did not reach seven-year mark before IIRIRA took effect). Those decisions required a show-

ing of subjective reliance, which is particularly challenging when the decisive event for the stop-time rule is the commission of a crime rather than a *quid pro quo* plea bargain. See *Martinez*, 523 F.3d at 376; but see *Gallegos-Vasquez v. Holder*, 636 F.3d 1181, 1189 (9th Cir. 2011) (pre-*Vartelas* case finding impermissible retroactive effect where alien had a "settled expectation" that he could later request discretionary relief). Indeed, we noted years ago: "It would border on the absurd to argue that these aliens might have decided not to commit drug crimes, or might have resisted conviction more vigorously, had they known that if they were not only imprisoned but also, when their prison term ended, ordered deported, they could not ask for a discretionary waiver of deportation." *LaGuerre v. Reno*, 164 F.3d 1035, 1041 (7th Cir. 1998).

The Supreme Court settled this question in *Vartelas*, however, by making clear that the presumption against retroactivity is supported by Congress's expectations, not the subjective expectations of the petitioner. 132 S. Ct. at 1491 ("The operative presumption, after all, is that Congress intends its laws to govern prospectively only."). We therefore conclude, consistent with the Second Circuit's reasoning in *United States v. Gill*, that the stop-time rule would attach a new disability to Jeudy's past conduct, rendering its application impermissibly retroactive. See 748 F.3d 491, 501–02 (2d Cir. 2014) (finding impermissible retroactivity in applying the aggravated felony bar to discretionary relief under old § 1182(c) for a pre-IIRIRA conviction although alien could not show subjective reliance).

Applying § 1229b(d)(1)(B) in this case would impose a new disability on pre-IIRIRA conduct without a clear statement from Congress indicating its intent to impose that dis-

ability. We therefore hold that Jeudy's 1995 drug conviction did not "stop time" for his continuous residence in the United States. His period of continuous residence for purposes of discretionary relief began with his admission as a lawful permanent resident in 1989, and he accrued the required seven years in 1996, before IIRIRA's stop-time rule took effect. He is eligible to request cancellation of removal under § 1229b(a).

We need not reach Jeudy's second argument, raised for the first time with his petition for judicial review, that he began a new period of continuous presence after illegally voting in 2000, allowing him to accrue another period of seven years as of 2007. Compare *Briseno-Flores v. Attorney General*, 492 F.3d 226, 231 (3d Cir. 2007) (BIA's interpretation barring new period of continuous presence is reasonable and entitled to *Chevron* deference), with *Okeke v. Gonzales*, 407 F.3d 585, 593–94 (3d Cir. 2005) (Ambro, J., concurring) (statutory phrase "any period" implies there can be more than one period; BIA's contrary interpretation does not deserve *Chevron* deference).

Accordingly, Jeudy is eligible to request cancellation of removal. The petition for review is GRANTED and the case is REMANDED for further administrative proceedings consistent with this opinion.