**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 13-1801**

———————

ABDUL AZIM JAGHOORI,

                Petitioner,

      v.

ERIC H. HOLDER, JR., Attorney General,

                Respondent.

———————

On Petition for Review of an Order of the Board of Immigration Appeals.

———————

Argued: September 17, 2014      Decided: November 18, 2014

———————

Before NIEMEYER, DUNCAN, and THACKER, Circuit Judges.

———————

Petition for review granted and case remanded by published opinion. Judge Thacker wrote the majority opinion, in which Judge Duncan joined. Judge Niemeyer wrote a dissenting opinion.

———————

**ARGUED:** Tamara L. Jezic, LAW OFFICE OF IVAN YACUB, Woodbridge, Virginia, for Petitioner. Lindsay M. Murphy, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Ivan Yacub, LAW OFFICE OF IVAN YACUB, Falls Church, Virginia, for Petitioner. Stuart F. Delery, Assistant Attorney General, Civil Division, Song Park, Senior Litigation Counsel, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

———————

THACKER, Circuit Judge:

An alien who wishes to apply for cancellation of removal must show, among other things, that he has continuously resided in the United States for seven years after admission to this country. See 8 U.S.C. § 1229b(a)(2). However, a statutory provision known as the stop-time rule provides that the commission of a criminal offense can cut short the alien's period of continuous residence. See id. § 1229b(d)(1)(B). In the case before us, the Board of Immigration Appeals ("BIA") has deemed Petitioner Abdul Azim Jaghoori ("Petitioner") ineligible for cancellation of removal because of a crime he committed within his first seven years of residence in the United States. Petitioner argues the BIA should not have applied the stop-time rule in his case because the offense and guilty plea occurred before Congress promulgated the stop-time rule.

The inquiry into a statute's retroactive effect is "informed and guided by 'familiar considerations of fair notice, reasonable reliance, and settled expectations.'" INS v. St. Cyr, 533 U.S. 289, 321 (2001) (quoting Martin v. Hadix, 527 U.S. 343, 358 (1999)) (internal quotation marks omitted). These considerations militate against retroactivity here. Accordingly, we apply our "'traditional presumption' against retroactivity," Olatunji v. Ashcroft, 387 F.3d 383, 393 (4th Cir. 2004) (citation omitted) (quoting Republic of Austria v.

2

<u>Altmann</u>, 541 U.S. 677, 694 (2004)), and grant the petition for review.

I.

The prospect of discretionary relief from removal has long been a fixture of immigration jurisprudence. Prior to the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), potential avenues for relief included a waiver of deportation pursuant to section 212(c) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c) (1994) (repealed 1996), and suspension of deportation pursuant to 8 U.S.C. § 1254(a)(1) (1994) (repealed 1996). To qualify for relief under either statute, an alien had to meet certain criteria.

Section 212(c) provided:

> Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to the provisions of subsection (a) of this section (other than paragraphs (3) and (9)(C)). . . . The first sentence of this subsection shall not apply to an alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years.

8 U.S.C. § 1182(c). Although, by its terms, the provision referred only to aliens seeking readmission after a temporary

3

departure, courts and the BIA came to apply the waiver in deportation proceedings "regardless of an alien's travel history." Judulang v. Holder, 132 S. Ct. 476, 480 (2011). The class of aliens qualifying for this form of relief was "extremely large," and a "substantial percentage" of these aliens succeeded in obtaining a waiver. INS v. St. Cyr, 533 U.S. 289, 295-96 (2001).

Suspension of deportation was harder to obtain. To qualify, an alien had to show that he was a "person of good moral character," and that his deportation would cause "extreme hardship" to him or his family. 8 U.S.C. § 1254(a)(1). The statute further limited relief to aliens who, at a minimum,[1] had been "physically present in the United States for a continuous period of not less than seven years immediately preceding" the application for relief. Id. Satisfying this continuous presence requirement was a simple matter, demanding nothing more than the passage of time; the clock continued to run even after deportation proceedings were under way. See Appiah v. U.S. INS, 202 F.3d 704, 707 (4th Cir. 2000).

---

[1] The number of years of continuous physical presence varied depending on the ground of deportation. For aliens deportable on criminal or security grounds, or for falsification of immigration documents, the statute required ten years of continuous physical presence. See 8 U.S.C. § 1254(a)(2) (repealed 1996). For other aliens, the requisite period was seven years. See id. § 1254(a)(1).

The 1996 enactment of IIRIRA eliminated both the section 212(c) waiver and suspension of deportation and replaced them with a new form of discretionary relief, dubbed "cancellation of removal." IIRIRA, Pub. L. No. 104-208, 110 Stat. 3009-546 (1996). The new provision, which governs here, authorizes the Attorney General to:

> cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—
>
> (1) has been an alien lawfully admitted for permanent residence for not less than 5 years,
>
> (2) has resided in the United States continuously for 7 years after having been admitted in any status, and
>
> (3) has not been convicted of any aggravated felony.

8 U.S.C. § 1229b(a). While the second of these requirements has analogs in the prior statutes, it does not operate the same way. Under a provision that has come to be known as the stop-time rule, the period of continuous residence is "deemed to end" upon the earlier of two events, which are spelled out in subsections (A) and (B) of the rule. Id. § 1229b(d)(1). Under subsection (A), the clock stops when the government serves a notice to appear for removal proceedings. Under subsection (B), it stops when the alien has committed an offense rendering him

5

inadmissible under § 1182(a)(2) or removable under § 1227(a)(2) or § 1227(a)(4).

Congress enacted IIRIRA on September 30, 1996. The bulk of its provisions, though, including the stop-time rule, did not take effect until April 1, 1997.[2] See § 309, 110 Stat. at 3009-625.

## II.

Petitioner is an Afghan citizen but has lived in the United States for most of his life. He was born in the Ghazni province in eastern Afghanistan. The family's Shia Muslim faith and Hazara ethnicity placed them within a small minority of the Afghan population. In the early 1980s, a time of war in that country, the family fled to Pakistan. Subsequently, at age 12, Petitioner entered the United States as a refugee. He acquired lawful permanent resident status on April 25, 1989.

During his stay in the United States, Petitioner has had several run-ins with law enforcement. The first -- and, for present purposes, most relevant -- of these was a credit card

---

[2] For aliens placed in deportation proceedings prior to the statute's effective date, there was a special "transitional" stop-time rule. See § 309(c)(5), 110 Stat. at 3009-627. This rule, as amended, provided that the permanent stop-time rule "shall apply to orders to show cause . . . issued before, on, or after the date of the enactment of this Act." Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, 111 Stat. 2193, 2196 (1997).

6

theft committed in Virginia on February 27, 1995. Petitioner pled guilty to this offense on July 14, 1995, and received a 90-day suspended jail sentence. Importantly, this conviction did not render him deportable. See 8 U.S.C. § 1251(a)(2)(A)(i) (1994) (authorizing deportation of an alien convicted of a crime involving moral turpitude ("CIMT"), but only if (1) the crime occurred within five years after the alien's date of entry, and (2) the alien was sentenced to confinement for one year or longer).

Petitioner's status as a lawful permanent resident remained secure even after Congress enacted IIRIRA in 1996. Though his criminal record grew to include one conviction for misdemeanor obstruction of justice and three convictions for driving under the influence, none of these offenses rendered him removable.

In September 2009, Petitioner traveled back to Afghanistan to do some work for his brother, who was in the construction business. He stayed for about a month. Upon his return, the Department of Homeland Security ("DHS") placed him into removal proceedings on the basis of the 1995 credit card theft conviction, alleging that this offense was a CIMT rendering him removable pursuant to 8 U.S.C. § 1227(a)(2)(A)(i).

7

DHS later withdrew this charge.[3]  Subsequently, in August 2010, a Virginia grand jury indicted Petitioner for attempting to pass a fraudulent prescription for OxyContin in violation of section 18.2-258.1 of the Virginia Code.  Petitioner pled guilty to this charge and received a two-year suspended jail sentence.

The 2010 prescription fraud conviction prompted DHS to bring two new charges of removability.  The first charge alleged that Petitioner's 1995 credit card theft and 2010 prescription fraud convictions were CIMTs "not arising out of a single scheme of criminal misconduct," thereby rendering him removable pursuant to 8 U.S.C. § 1227(a)(2)(A)(ii).  The second charge alleged that the prescription fraud conviction, by itself, was grounds for removal pursuant to § 1227(a)(2)(B)(i).[4]

Petitioner, through counsel, conceded removability pursuant to § 1227(a)(2)(A) and proceeded to file an application

---

[3] The record does not explain why DHS brought this charge, only to withdraw it a short time later.  We observe, though, that Petitioner's 1995 credit card theft did not occur within five years of his admission to the United States, as would be required for removal pursuant to 8 U.S.C. § 1227(a)(2)(A)(i) (2006).

[4] This section provides, in pertinent part, that an alien is deportable if "at any time after admission [he] has been convicted of a violation of . . . any law or regulation . . . relating to a controlled substance (as defined in section 802 of Title 21), other than a single offense involving possession for one's own use of 30 grams or less of marijuana."  8 U.S.C. § 1227(a)(2)(B)(i).

8

for asylum, withholding of removal, and cancellation of removal. The immigration judge ("IJ") ordered his removal to Afghanistan. However, in view of Petitioner's ethnicity and religion and his many years in the United States, the IJ granted his application for withholding of removal. This decision allows Petitioner to remain in the United States for the time being, but it does not accord an opportunity to pursue citizenship, nor does it prevent immigration authorities from removing him to a country other than Afghanistan. See 8 C.F.R. § 1208.16(f) (2014); In re Lam, 18 I. & N. Dec. 15, 18 (BIA 1981).

Cancellation of removal would preserve Petitioner's opportunity to seek permanent residence, but the IJ denied Petitioner's application for this form of relief on the ground that the 1995 credit card theft triggered the stop-time rule, 8 U.S.C. § 1229b(d)(1). In response, Petitioner filed an appeal with the BIA, arguing that the stop-time rule was prospective only and could not apply to the pre-IIRIRA credit card theft. The BIA dismissed the appeal. Applying the stop-time rule to Petitioner's pre-IIRIRA credit card offense, the BIA said, cannot produce an impermissible retroactive effect here because Petitioner did not become removable until the 2010 prescription fraud. Invoking the Supreme Court's rationale in Fernandez-Vargas v. Gonzales, 548 U.S. 30 (2006), the agency reasoned that it was Petitioner's "'choice to [engage in illegal conduct]

9

after the effective date of the new law (i.e., the IIRIRA), that subjects him to the new and less generous legal regime (i.e., the application of the stop-time rule).'" A.R. 16-17 (alteration in original) (quoting Fernandez-Vargas, 548 U.S. at 44).[5]

## III.

We have jurisdiction to review a final order of removal pursuant to 8 U.S.C. § 1252(a)(1). Our power to review such orders is limited by § 1252(a)(2)(B), which restricts judicial review of decisions denying cancellation of removal, and by § 1252(a)(2)(C), which restricts judicial review of any final order against an alien who, like Petitioner, is removable because of a drug offense covered in § 1227(a)(2)(B). These restrictions, however, are of no moment here because the permissibility of applying a statute retroactively is a "pure question of law," Fox v. Balt. City Police Dep't, 201 F.3d 526, 531 (4th Cir. 2000), and therefore subject to judicial review. See § 1252(a)(2)(D).

We review legal questions de novo. Salem v. Holder, 647 F.3d 111, 115 (4th Cir. 2011). Although we generally defer to agency interpretations of statutes that are ambiguous, "a

---

[5] Citations to the "A.R." refer to the Administrative Record filed by the parties in this appeal.

10

statute that is ambiguous with respect to retroactive application is construed . . . to be unambiguously prospective." INS v. St. Cyr, 533 U.S. 289, 320 n.45 (2001). We therefore do not defer to the BIA's interpretation of the stop-time rule.

IV.

Where applicable, subsection (B) of the stop-time rule cuts off an alien's period of continuous residence upon either of the following: (1) the alien commits an offense that renders him inadmissible under 8 U.S.C. § 1182(a)(2), or (2) the alien commits an offense that renders him removable under §§ 1227(a)(2) or 1227(a)(4). See § 1229b(d)(1)(B). The latter cannot justify the application of the stop-time rule here because Petitioner was not removable within seven years of his admission to the United States. Nevertheless, because the BIA characterized Petitioner's 1995 credit card theft as a crime involving moral turpitude, which would render him inadmissible pursuant to § 1182(a)(2)(A)(i)(I),[6] we must determine whether subsection (B) of the stop-time rule operates against him.

The retroactivity of the stop-time rule is, at bottom, a question of congressional intent. See Olatunji v. Ashcroft,

---

[6] This provision states that an alien who commits a crime involving moral turpitude, other than a purely political offense, is inadmissible, except as otherwise provided. See § 1182(a)(2)(A)(i)(I).

11

387 F.3d 383, 389 (4th Cir. 2004). Under Landgraf v. USI Film Products, 511 U.S. 244 (1994), our analysis proceeds in two steps. First, we ask "whether Congress has expressly prescribed the statute's proper reach." Id. at 280. "If Congress has made its intent clear, while acting within the limits of its power, our inquiry is concluded." Tasios v. Reno, 204 F.3d 544, 548 (4th Cir. 2000). If, conversely, Congress did not speak with the requisite clarity, we proceed to Landgraf's second step and ask "whether the new statute would have retroactive effect." Landgraf, 511 U.S. at 280. Here we assess whether the statute "attaches new legal consequences to events completed before its enactment." Id. at 269-70. If so, then "in keeping with our traditional presumption against retroactivity, we presume that the statute does not apply to that conduct." Martin v. Hadix, 527 U.S. 343, 352 (1999) (internal quotation marks omitted).

A.

In this case, the BIA took no position on whether Congress clearly intended for the stop-time rule to operate retroactively. Its decision assumed arguendo that the statute is "silent" with regard to congressional intent. A.R. 15. Neither party argues that this was in error.

The requirement of a clear congressional directive, necessary for disposition under Landgraf step one, is a "demanding" one. INS v. St. Cyr, 533 U.S. 289, 316 (2001). The

12

prescriptive language in the statute must be express, unambiguous, and unequivocal. See id.; Gordon v. Pete's Auto Serv. of Denbigh, Inc., 637 F.3d 454, 459 (4th Cir. 2011). We are satisfied that Congress did not expressly and unambiguously prescribe the proper reach of the stop-time rule,[7] and we proceed, accordingly, to Landgraf's second step.

## B.

"A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment." Tasios, 204 F.3d at 550 (quoting Landgraf, 511 U.S. at 269) (internal quotation marks omitted). The question, rather, is whether the statute "would attach new legal consequences to prior events." Chambers v. Reno, 307 F.3d 284, 289 (4th Cir. 2002). In this regard, a statute "must be deemed retrospective" if, as Justice Story long ago stated, it "takes away or impairs vested rights acquired under existing

---

[7] Three circuits examining the stop-time rule under Landgraf step one have concluded that Congress did not expressly prescribe the statute's reach. See Jeudy v. Holder, 768 F.3d 595, 600-03 (7th Cir. 2014); Martinez v. INS, 523 F.3d 365, 370-72 (2d Cir. 2008); Sinotes-Cruz v. Gonzales, 468 F.3d 1190, 1199 (9th Cir. 2006). But see Heaven v. Gonzales, 473 F.3d 167, 175 (5th Cir. 2006) (reasoning that Congress must have intended for the permanent stop-time rule to apply retroactively, since it was clear in stating that the "transitional" stop-time rule, Pub. L. No. 104-208, § 309(c)(5), 110 Stat. 3009-546, -627 (1996), should have a retroactive effect in exclusion and deportation proceedings pending when IIRIRA became effective).

13

laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." Soc'y for the Propagation of the Gospel v. Wheeler, 22 F. Cas. 756, 767 (C.C.D.N.H. 1814) (No. 13,156).

This inquiry into a statute's retroactive effect "'demands a commonsense, functional judgment.'" St. Cyr, 533 U.S. at 321 (quoting Hadix, 527 U.S. at 357). The judgment "'should be informed and guided by "familiar considerations of fair notice, reasonable reliance, and settled expectations."'" Id. (quoting Hadix, 527 U.S. at 358).

The circumstances presented here are remarkably similar to those in Jeudy v. Holder, 768 F.3d 595 (7th Cir. 2014). As with Petitioner, the alien in Jeudy acquired lawful permanent resident status in 1989. Both men pled guilty to a crime in 1995. See 768 F.3d at 597. By the time IIRIRA took effect in 1997, both had attained the seven years of continuous residence required to seek discretionary relief under pre-IIRIRA law. See id. Both, too, continued to reside in the United States until the government initiated removal proceedings in 2009, a full 20 years after they acquired lawful permanent resident status and more than a decade after they reached seven years of continuous residence. See id.

14

The Jeudy court declared that applying the stop-time rule to Jeudy's 1995 offense and conviction "would attach a new and serious consequence to Jeudy's criminal conduct that was completed before IIRIRA took effect." 768 F.3d at 603-04. The effect in Petitioner's case is the same. When Petitioner pled guilty to credit card theft in 1995, his conviction did not foreclose his opportunity to qualify for discretionary relief. Petitioner continued to accrue the seven years of unrelinquished domicile necessary for a section 212(c) waiver and the seven years of continuous physical presence necessary for suspension of deportation. Indeed, by the time Congress enacted IIRIRA in September 1996, Petitioner had been living in the United States long enough to qualify for both forms of relief. A retroactive application of the stop-time rule would not merely imperil Petitioner's opportunity to seek permanent relief from removal; it would render such relief an impossibility. Absent a clear congressional directive, we cannot assume that Congress intended the rule to have this effect.

The Government notes that both the Second and Tenth Circuits have identified circumstances in which the retroactive application of the stop-time rule does not produce an impermissible effect. See Kleynburg v. Holder, 525 F. App'x 814, 819 (10th Cir. 2013); Martinez v. INS, 523 F.3d 365, 373 (2d Cir. 2008). These cases are distinguishable from the

15

present case in two critical ways. First, in each of these cases, the pre-IIRIRA crime rendered the alien immediately deportable. Second, the alien had not yet accrued seven years of continuous residence when IIRIRA took effect.

These factors were critical to the Second Circuit's decision in Martinez. Under the circumstances in that case, the court said, there was nothing to prevent the government from prosecuting the alien and securing an order of deportation before the alien reached seven years of continuous residence. See Martinez, 523 F.3d at 374. But for the "time required to bring an offender to justice," the alien would never have become eligible for discretionary relief, and there would be no expectation for the stop-time rule to unsettle. Id.

In this respect, the circumstances of Petitioner's case bear a closer resemblance to Sinotes-Cruz v. Gonzales, 468 F.3d 1190 (9th Cir. 2006). There, the alien's pre-IIRIRA convictions did not expose him to deportability under pre-IIRIRA law. See id. at 1202. The alien continued to live in the United States and, like Petitioner, was a seven-year resident when IIRIRA became law. See id. The Ninth Circuit recognized that the imposition of the stop-time rule would have "serious adverse consequences" for the alien. Id. It held, therefore, that the rule must not apply to him. See id. at 1202-03.

16

We think it important to note, too, that both here and in Sinotes-Cruz the government procured the aliens' pre-IIRIRA convictions via guilty plea. The means of conviction are relevant to our assessment of retroactive effect because, as the Supreme Court observed in INS v. St. Cyr, an alien who decides to plead guilty cannot help but be "acutely aware" of the consequences of conviction. 533 U.S. at 322. In St. Cyr, an alien pled guilty to a drug offense prior to the passage of IIRIRA. See id. at 293. His conviction rendered him deportable, but, under the law at that time, he remained eligible to apply for a discretionary waiver under section § 212(c). See id. IIRIRA's abolishment of the section 212(c) waiver took this opportunity away from him. The Court, noting that aliens under pre-IIRIRA law had a "significant likelihood of receiving § 212(c) relief," reasoned that aliens "almost certainly relied" on this likelihood "in deciding whether to forgo their right to a trial." Id. at 325. The interference with this expectation, the Court concluded, was an impermissible retroactive effect. See id.

Here, the Government argues that Petitioner, unlike the alien in St. Cyr, had no reason to concern himself with the availability of discretionary relief at the time of his 1995 guilty plea, since that offense did not render him deportable. This is a questionable assumption, and in any event irrelevant,

17

as we have emphatically declared that subjective reliance is not an essential element of retroactive effect. See Olatunji, 387 F.3d at 389, 394 ("Whether the particular petitioner did or did not subjectively rely upon the prior statute or scheme has nothing whatever to do with Congress' intent -- the very basis for the presumption against statutory retroactivity.").

There can be no doubt that the right to go to trial is a valuable one. A retroactive application of the stop-time rule would impose new and unforeseen consequences on Petitioner's decision to relinquish this right. This is impermissible.

C.

The Government does not deny that the stop-time rule imposes new legal consequences on Petitioner. It contends, though, that Petitioner has no right to complain about those consequences because he was not "helpless to avoid" them. Resp't's Br. 6. But for his 2010 prescription fraud, it notes, the effects of our immigration laws -- including the stop-time rule -- would never have come to bear on him.

We cannot agree that the retroactive effect of the stop-time rule is diminished because of actions Petitioner took after the rule's enactment. The question before us is whether we may presume that a statute enacted in 1996 does not apply retroactively to events in 1995. Petitioner's conduct in 2010

18

gives us occasion to address this question, but it does not change the answer.

Indeed, as Supreme Court precedent and our own case law make clear, a statute may have an impermissible retroactive effect on an alien even if the immigration consequences of that statute were avoidable. See Vartelas v. Holder, 132 S. Ct. 1479, 1487-88 (2012); Olatunji, 387 F.3d at 392. The Supreme Court was clear on this point in Vartelas v. Holder, a case involving another alien with a criminal conviction predating IIRIRA. The alien in Vartelas, a Greek immigrant, took a one-week trip abroad in 2003, long after IIRIRA effectively precluded foreign travel by aliens with criminal records like his. The Government argued that the statute had no retroactive effect at all, since it was the post-IIRIRA act of returning to the United States -- and not the immigrant's pre-IIRIRA conviction -- that triggered the statute. The Court deemed this argument "disingenuous," stating:

> [The immigrant's] return to the United States occasioned his treatment as a new entrant, but the reason for the "new disability" imposed on him was not his lawful foreign travel. It was, indeed, his conviction, pre-IIRIRA, of an offense qualifying as one of moral turpitude. That past misconduct, in other words, not present travel, is the wrongful activity Congress targeted in § 1101(a)(13)(C)(v).

132 S. Ct. at 1488-89.

19

The text of the stop-time rule, similarly, leaves no doubt about the "wrongful activity" that Congress designed it to target. The object of subsection (B) is to ensure that an alien who commits an enumerated criminal offense within seven years of admission to the United States does not go on to become eligible for discretionary relief while immigration proceedings against him inch slowly toward a resolution. See Ram v. INS, 243 F.3d 510, 518 (9th Cir. 2001) (explaining that Congress "enacted the stop-time rule in response to a belief that aliens sought to delay deportation proceedings in order to meet the continuous physical presence requirement"). The rule is unconcerned with the particular events that give rise to the alien's removal; indeed, it operates the same way no matter what brought about the removal. The only crimes that come within its scope are those committed before the fulfilment of the continuous-residence requirement. In this way, the rule reserves its effect for aliens who "abuse[] the hospitality of this country" within a short time of being welcomed here. In re Perez, 22 I. & N. Dec. 689, 700 (BIA 1999).

The Government likens this case to Fernandez-Vargas v. Gonzales, 548 U.S. 30 (2006), but the comparison is inapt. The alien in that case had ample opportunity to seek an adjustment of status before IIRIRA took that opportunity away from him. See id. at 45. He simply neglected to take advantage of it.

20

See id. at 45-46. This rationale does not apply to Petitioner. He did not sleep on his rights. How could he, when the law that threatened his ability to seek relief, IIRIRA, was on the books before his need for that relief had even arisen?

We do not hold that Petitioner had a right to commit more crimes. He does not, and the repercussions of his conduct have, accordingly, come to bear on him twice to date –– first when the criminal court convicted him, and second when the IJ issued an order of removal. We simply hold that the government cannot use the stop-time rule to add yet one more repercussion to that list. A lawful resident who has lived in the United States long enough to merit consideration for relief from removal has a settled expectation in his opportunity to request such relief. Courts may not disturb that expectation absent clear evidence that Congress intended that effect.

V.

For the foregoing reasons, we grant the petition for review and remand the case to the BIA for proceedings consistent with this opinion.

PETITION FOR REVIEW GRANTED AND CASE REMANDED

21

NIEMEYER, Circuit Judge, dissenting:

Abdul Jaghoori, a native and citizen of Afghanistan and a lawful permanent resident of the United States since 1989, was convicted of at least two crimes involving moral turpitude while residing in Virginia -- a 1995 conviction for credit card theft and a 2010 conviction for prescription fraud. He concedes that the two convictions render him removable under 8 U.S.C. § 1227(a)(2)(A)(ii). Jaghoori seeks discretionary relief from his order of removal with his application for, among other things, cancellation of removal under 8 U.S.C. § 1229b(a). That section authorizes the Attorney General to cancel a lawful permanent resident's removal if the resident:

> (1)  has been an alien lawfully admitted for permanent residence for not less than 5 years,
>
> (2)  <u>has resided in the United States continuously for 7 years</u> after having been admitted in any status, and
>
> (3)  has not been convicted of any aggravated felony.

8 U.S.C. § 1229b(a) (emphasis added).

The BIA denied Jaghoori's application for cancellation of removal because he was unable to show, as required by § 1229b(a)(2), that he had resided in the United States as a lawful permanent resident "continuously for 7 years." Under the "stop-time rule" of § 1229b(d)(1), his 1995 conviction for credit card fraud cut off the running of the seven-year residency period short of seven years, because it would have

22

rendered him ineligible for admission into the United States under 8 U.S.C. § 1182(a)(2)(A)(i)(I). Jaghoori noted, however, that his 1995 conviction preceded the effective date of the stop-time rule, which was enacted in 1996 as part of Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (codified as amended in scattered sections of the U.S. Code). Jaghoori maintained therefore that applying the rule in his case would give it impermissible retroactive effect. The BIA rejected this argument, explaining:

> [W]hen assessing statutory eligibility or discretionary merit for a grant of cancellation of removal, we . . . necessarily look at a variety of antecedent events, including events that are both favorable and unfavorable to the alien, and . . . an alien's past criminal conduct may well impact on the operation of the statute, but only to the extent of defining the authority to grant discretionary relief to removable aliens.

*    *    *

> [W]e find that it is the respondent's choice to engage in illegal conduct [underlying his 2010 conviction] after the effective date of the new law (i.e., the IIRIRA), that subjects him to the new and less generous legal regime (i.e., the application of the stop-time rule), not a past act that he is helpless to undo up to the moment the Government finds him out.

A.R. 16-17 (internal quotation marks omitted).

On appeal, Jaghoori again presses his argument that applying the 1996 stop-time rule of § 1229b(d)(1) (effective April 1, 1997) to his 1995 conviction in order to deny his 2011

23

application for cancellation of removal "attaches new legal consequences to [his] 1995 guilty plea, and, as such, [the rule] should not be applied retroactively," citing Landgraf v. USI Film Products, 511 U.S. 244 (1994).

Because the legal consequence on Jaghoori's immigration status only attached once Jaghoori committed a second crime 13 years after IIRIRA's enactment, I believe that the BIA got it right. Therefore, I would reject Jaghoori's argument and affirm the BIA's ruling.

In Landgraf, the Supreme Court laid out a two-part test for determining whether a statute applies retroactively. First, a court must "determine whether Congress has expressly prescribed the statute's proper [temporal] reach." Landgraf, 511 U.S. at 280. "If so, this is the end of the analysis and there is no need 'to resort to judicial default rules.'" Appiah v. INS, 202 F.3d 704, 708 (4th Cir. 2000) (quoting Landgraf, 511 U.S. at 280). But if the statute fails to define expressly its temporal reach, the court must determine whether the statute would have an "impermissible retroactive effect." INS v. St. Cyr, 533 U.S. 289, 320 (2001). Any retroactive effect is impermissible absent "clear congressional intent favoring such a result." Landgraf, 511 U.S. at 280; see also St. Cyr, 533 U.S. at 316.

Because I agree with the majority that Congress did not expressly prescribe the stop-time rule's temporal reach, I too

24

would resolve this case under Landgraf's second step, determining whether the statute has a retroactive effect on Jaghoori's 1995 conviction.

A statute does not operate retroactively "merely because it is applied in a case arising from conduct antedating the statute's enactment," or because it "upsets expectations based in prior law." Landgraf, 511 U.S. at 269. Rather, a statute has retroactive effect when it "attaches new legal consequences to events completed before its enactment," id. at 270, by "[1] tak[ing] away or impair[ing] vested rights acquired under existing laws, or [2] creat[ing] a new obligation, impos[ing] a new duty, or attach[ing] a new disability, in respect to transactions or considerations already past," id. at 269 (emphasis added) (quoting Soc'y for the Propagation of the Gospel v. Wheeler, 22 F. Cas. 756, 761 (C.C.D.N.H. 1814) (No. 13,156)). Because the Supreme Court made clear in Fernandez-Vargas v. Gonzales, 548 U.S. 30, 44 n.10 (2006), that cancellation of removal is not a vested right -- i.e., "a term that describes something more substantial than inchoate expectations and unrealized opportunities" -- IIRIRA would only have a retroactive effect on Jaghoori if it created a new obligation or attached a new disability to his prior conduct. And this judgment must "be informed and guided by familiar considerations of fair notice, reasonable reliance, and settled

25

expectations." St. Cyr, 533 U.S. at 321 (quoting Martin v. Hadix, 527 U.S. 343, 358 (1999)) (internal quotation marks omitted).

The majority asserts that the stop-time rule attached a new disability to Jaghoori's 1995 conviction by preventing him from accruing additional years of continuous residence. But the seven-year period of continuous residence is significant only for one purpose -- obtaining discretionary relief from removal. In 1995, Jaghoori had no need for this discretionary relief, as his 1995 conviction did not change his status as a lawful permanent resident or render him deportable. Nor did he need such relief on April 1, 1997, when IIRIRA went into effect, because, as the majority acknowledges, Jaghoori's "status as a lawful permanent resident remained secure even after Congress enacted IIRIRA in 1996." Ante, at 7. His eligibility for cancellation of removal and the attendant seven-year residency requirement became relevant only after he committed the prescription-fraud crime in 2010.

To be sure, IIRIRA did apply more generously to one who had committed no crime in the past. But one who had already committed a crime could nonetheless avoid any future deportation simply by abiding by the law and not committing a second crime involving moral turpitude. See Fernandez-Vargas, 548 U.S. at 44 (noting that "the alien's choice" after enactment of a "new and

26

less generous legal regime" was the cause of his ineligibility for discretionary relief). Thus, while the majority frames Jaghoori's disability from the enactment of IIRIRA in terms of his loss of the accrual of years of continuous residence, the disability was, in actuality, Jaghoori's inability to commit future crimes while remaining eligible for discretionary relief in the event that a removal proceeding were to be instituted against him.

Properly framed, the inability to commit a future crime cannot be considered a new disability because Jaghoori was never entitled to commit crimes in the first place. Jaghoori had no greater right to commit crimes before IIRIRA was enacted than he did thereafter. Nor did IIRIRA impose any new duties upon Jaghoori, since he was already required to obey the law.

The Supreme Court has so far recognized only two circumstances in which application of IIRIRA to past conduct would amount to a new disability: (1) where it would effectively ban an alien's travel outside the United States, Vartelas v. Holder, 132 S. Ct. 1479, 1487 (2012); and (2) where it would convert deportation from a mere possibility to an absolute certainty, St. Cyr, 533 U.S. at 323. Even if an alien's inability to commit future crimes without immigration consequences could be considered a disability, it would be far less debilitating than those categories of disability previously

27

recognized by the Supreme Court and therefore would not be cognizable under Landgraf's second step.

The conclusion that § 1229b(d)(1) does not impose a new disability on Jaghoori's 1995 conviction is inevitable when one considers Jaghoori's reliance interests. Although the majority insists that whether Jaghoori relied on the availability of discretionary relief at the time of his 1995 conviction is "irrelevant," ante, at 17, the Supreme Court has held to the contrary, see Vartelas, 132 S. Ct. at 1491 ("While the presumption against retroactive application of statutes does not require a showing of detrimental reliance, reasonable reliance has been noted among the 'familiar considerations' animating the presumption" (citation omitted) (quoting Landgraf, 511 U.S. at 270)). Indeed, as the majority itself recognizes, reliance played a big part in the Court's reasoning in St. Cyr. See 533 U.S. at 325. And we have expressly held that an alien cannot "reasonably rely 'on the availability of a discretionary waiver of deportation when choosing to engage in illegal . . . activity.'" Tasios v. Reno, 204 F.3d 544, 551 (4th Cir. 2000) (quoting De Osorio v. INS, 10 F.3d 1034, 1042 (4th Cir. 1993)); see also LaGuerre v. Reno, 164 F.3d 1035, 1041 (7th Cir. 1998) ("It would border on the absurd to argue that these aliens might have decided not to commit drug crimes . . . had they known that if they were not only imprisoned but also, when their prison

28

term ended, ordered deported, they could not ask for a discretionary waiver of deportation"); St. Cyr v. INS, 229 F.3d 406, 418 (2d Cir. 2000), aff'd, 533 U.S. 289; Jurado-Gutierrez v. Greene, 190 F.3d 1135, 1150 (10th Cir. 1999).

Additionally, when "fair notice . . . and settled expectations" are taken into consideration, Landgraf, 511 U.S. at 270, application of the stop-time rule to Jaghoori would not be inequitable. Indeed, the circumstances of the present case are substantially similar to those in Fernandez-Vargas. In that case, 21 years after Fernandez-Vargas illegally returned to the United States, the United States sought, in 2003, to reinstate an earlier deportation order entered against him. Fernandez-Vargas, 548 U.S. at 35-36. Before IIRIRA's enactment in 1996, the reinstatement of a deportation order was subject to a discretionary waiver. But IIRIRA changed that, mandating that all illegal reentrants are to have their orders of removal reinstated without any possibility of discretionary relief. Id. at 34-35. Rejecting the claim that IIRIRA had an impermissible retroactive effect when applied to Fernandez-Vargas, the Supreme Court stated that it was "the alien's choice to continue his illegal presence, after illegal reentry and after the effective date of the new law, that subject[ed] him to the new and less generous legal regime, not a past act that he [was] helpless to undo." Id. at 44. Moreover, the Court noted, in the six-month

period between IIRIRA's passage and its effective date, Fernandez-Vargas "had an ample warning that the new law could be applied to him and ample opportunity to avoid that very possibility by leaving the country." Id. at 45.

The same can be said about Jaghoori. Like Fernandez-Vargas, Jaghoori became ineligible for discretionary relief with IIRIRA's enactment. But it was Jaghoori's choice in 2010 to commit a second crime involving moral turpitude that rendered him removable in the first place, thus "subject[ing] him[self] to the new and less generous legal regime." Fernandez-Vargas, 548 U.S. at 44; see also Olatunji v. Ashcroft, 387 F.3d 383, 398 (4th Cir. 2004) ("[A] statute[] do[es] not have a retroactive effect when a party has an opportunity to avoid all of its new consequences"). And the 13-year period between the enactment of IIRIRA and Jaghoori's second crime in 2010 gave him "ample warning" of the existence of the stop-time rule and the fact that it could result in his removal from the United States upon his commission of another crime.

Finally, the cases on which the majority relies are inapposite. In Jeudy v. Holder, 768 F.3d 595, 597 (7th Cir. 2014), the petitioner's pre-IIRIRA conviction itself rendered him deportable. Thus, the passage of IIRIRA meant that if the government ever got around to bringing removal proceedings, the petitioner was helpless to obtain discretionary relief. Here,

30

the government had no basis to remove Jaghoori until he committed a second crime involving moral turpitude after IIRIRA's passage. Indeed, the majority purports to distinguish cases from two other circuits on this exact same ground. Ante, at 16 ("[I]n each of these cases, the pre-IIRIRA crime rendered the alien immediately deportable"). Similarly, in Sinotes-Cruz v. Gonzales, 468 F.3d 1190, 1193 (9th Cir. 2006), IIRIRA reclassified the petitioner's prior crimes as crimes involving moral turpitude in a provision that Congress explicitly made retroactive, making the petitioner immediately removable under § 1227(a)(2)(A)(i) upon IIRIRA's effective date. Again, Jaghoori did not become removable until he committed a second crime. Had Jaghoori been law abiding, IIRIRA's enactment would have produced absolutely no adverse consequences; he would have retained his lawful permanent residence status to this day. And finally, in Vartelas, the Court repeatedly stressed that Vartelas "engaged in no criminal activity after IIRIRA's passage." 132 S. Ct. at 1489.

Because IIRIRA's stop-time rule imposed no new disability on Jaghoori and thus did not have any retroactive effect, I would deny his petition for review.